IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THE CINCINNATI INSURANCE COMPANY,
a Subrogee of Ohio County Commission
and Ohio County Development Authority,

      Plaintiff,

v.                                          Civil Action No. 5:10CV7
                                                          (STAMP)
COST COMPANY and
PEDERSEN & PEDERSEN, INC.,

      Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT COST COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

I. Procedural History

The plaintiff, The Cincinnati Insurance Company ("Cincinnati"), filed a complaint against Cost Company ("Cost") and Pedersen & Pedersen, Inc. ("Pedersen") in the Circuit Court of Ohio County, West Virginia alleging negligence and breach of contract. The defendants removed this action to this Court. Defendant Pedersen filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which this Court granted. Cost then filed a motion for summary judgment to which the plaintiff responded and Cost replied.

II. Facts

Cincinnati insured the Ohio County Commission ("Commission") and the Ohio County Development Authority ("OCDA") pursuant to an insurance policy which provided builder's risk coverage for the

period of December 17, 2007 to December 17, 2008.  The Commission and the OCDA were the developers of a motion picture cinema project located at the Highlands, near Wheeling, West Virginia.  The OCDA contracted with defendant Cost for construction work for the project.  The Commission and the OCDA contracted with defendant Pedersen for Pedersen to act as the construction manager.

On or about January 9, 2008, masonry walls constructed by Cost collapsed during a period of inclement weather, allegedly because Cost failed to provide appropriate temporary bracing for the walls.  The Commission and OCDA incurred costs in the cleanup and replacement of the collapsed walls.  Cincinnati, as a result of the collapse of the walls and pursuant to the terms and conditions of the insurance policy, made $641,560.96[1] in payment to or on behalf of the Commission and OCDA.  Cincinnati therefore brings this suit as subrogee of the Commission and the OCDA.

On February 27, 2008, Cincinnati sent Cost a letter.  In the letter, Cincinnati states that it believed Cost "may be responsible for the damages sustained" by OCDA and that Cincinnati was "placing [Cost] on notice of this potential claim."  The letter stated that Cost should immediately advise its liability insurance carrier about Cincinnati's potential claim against Cost.  (Document No. 24,

---

[1] The plaintiff's complaint alleges that it paid $644,591.96 to its insureds, but in a later certification of Nicholas M. Ewart, a claims representative for Cincinnati, Cincinnati states it made payments to its insureds totaling $641,560.96.

2

Pl.'s Mem. of Law in Opp'n, Ex. 1). On March 3, 2008, Cost responded by letter. In its letter, Cost asks Cincinnati for its investigation report, stating that Cost's investigation revealed the wall collapse was due to unusually high wind gusts. Cost informed Cincinnati that its liability carrier is Liberty Mutual Insurance Company. It provided Cincinnati with its claims adviser's name, the claim number and the claims adviser's phone number. Cost stated that Cincinnati should be advised that if Cincinnati "attempt to subrogate against Cost, Cost will vigorously defend in that Cost had sufficiently braced the walls in accordance with the standards in the industry and was not the cause of the wall collapse." (Document No. 24, Pl.'s Mem. of Law in Opp'n, Ex. 2).

On October 24, 2008, Cost filed a civil action against OCDA, Marquee Cinemas-WV, Inc., and Goldman Sachs Specialty Lending Group, L.P., in the Circuit Court of Ohio County, West Virginia for enforcement of a mechanics' lien and for non-payment in connection with the contract between them and construction done by Cost at the Marquee Cinema project. Cost sought damages from OCDA for $141,576.83, which remained to be paid under the contract. The Ohio County litigation was settled and dismissed with prejudice and OCDA paid a monetary settlement to Cost. Cincinnati was unaware of the Ohio County litigation.

The adjustment of the loss by Cincinnati took approximately one year to conclude. At the conclusion of the adjustment, on December 18, 2008, the insureds executed a "Sworn Statement in Proof of Loss" ("Proof of Loss"). (Document No. 24, Pl.'s Mem. of Law in Opp'n, Ex. 3, Ex. A). The Proof of Loss states that "the undersigned hereby subrogates said Company to all of the rights, claims, and interests which the undersigned may have against any party . . . for the loss . . . and authorizes the said Company to sue . . . in the undersigned's name . . ." The Proof of Loss further states, "Warranted no settlement has been made by the undersigned with any party . . . against whom a claim may lie, and no release has been given to anyone responsible for the loss, and that no such settlement will be made nor release given by the undersigned without the written consent of the said Company . . ."

### III. Applicable Law

Under Federal Rule of Civil Procedure ("Rule") 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come

4

forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)(Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))).

In Celotex, the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

5

the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 912 F.2d 73, 78 (4th Cir. 1990), cert. denied, 502 U.S. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Discussion

### A. Judicial Estoppel

Cost filed a summary judgment motion arguing that Cincinnati has no standing to bring this action because Cincinnati's subrogation claim derives entirely from its relationship with OCDA. Cost argues that Cincinnati only has those rights against Cost that OCDA would have and because OCDA waived its rights to any claim against Cost by not filing a counterclaim in the previous Ohio County litigation, Cincinnati's rights have also been waived.

Cincinnati argues that Cost is judicially estopped from arguing that Cincinnati's claims should have been brought in the earlier action. In order for judicial estoppel to bar a party's claims, it must be shown that (1) the party to be estopped is adopting a position inconsistent with a stance taken in prior litigation; (2) the prior inconsistent position was accepted by the court; and (3) the party to be estopped intentionally misled the

6

court to gain an unfair advantage. <u>1000 Friends of Md. v. Browner</u>, 265 F.3d 216 (4th Cir. 2001).

This Court finds that none of the factors are present in this case. Cincinnati argues that Cost has taken a directly inconsistent position than it took in the previous action by failing to join Cincinnati or explain to the court why Cincinnati was not being joined in that action. Cincinnati argues that by failing to join Cincinnati or identify Cincinnati's claim to the state court, Cost intentionally misrepresented to the state court that there were no other parties whose interests would be impaired or impeded if they were not joined in that action. This Court cannot agree. This Court has reviewed the state court complaint in the previous litigation. That suit involved Cost asserting that it was owed money for the work performed on the cinema project. There is no inconsistent position. As to the second prong, there was never any judicial determinations of fact or law because of the settlement. Finally, conclusory allegations that Cost intentionally misled the court will not suffice. Cincinnati has failed to point to any intentional misrepresentation and this Court cannot find one. To the extent Cincinnati alleges that Cost intentionally misled the court by not joining Cincinnati as a defendant, this Court cannot find intentional misrepresentation. Cincinnati believes it placed Cost on notice with its February 27, 2008 letter. That letter states only the potential for a

7

subrogation action. When Cost initiated the suit for payment on the contract, OCDA had still not executed the Proof of Loss, which provided for the subrogation.

This Court finds that Cost is not judicially estopped from arguing that any claim by Cincinnati should have been brought as a compulsory counterclaim in the previous action. Accordingly, this Court will proceed to the merits of the defendant's motion.

B. Compulsory Counterclaim

West Virginia Rule of Civil Procedure 13(a)[2] provides in pertinent part:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Pursuant to this rule, if a compulsory counterclaim is not brought in a West Virginia state court action, the claim is later barred. Carper v. Kanawha Banking & Trust Co., 207 S.E.2d 897, 920 (W. Va. 1974).

Cincinnati argues that it is not the "pleader" under the rule, thus its claim cannot have been a compulsory counterclaim in the state court action. Cincinnati does, however, at the same time,

---

[2] While a federal court sitting in diversity applies the Federal Rules of Civil Procedure, because this Court is addressing whether Cincinnati's claim was a compulsory claim in the previous state court litigation, this Court analyzes the West Virginia Rules of Civil Procedure.

8

bring this action as a subrogee of OCDA. "The doctrine of subrogation is that one who has the right to pay, and does pay, a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other." Ray v. Donohew, 352 S.E.2d 729, 737 (W. Va. 1986). Subrogation is founded upon principles of equity and justice and is a derivative right. Id. "The subrogated party can claim no greater rights than the party has to whose rights he is subrogated." Butts v. Sun Lumber Co., 95 S.E. 585, 588 (W. Va. 1918). Because OCDA was a "pleader" in the state court action and answered Cost's complaint, Rule 13(a) applies to OCDA and by subrogation to Cincinnati. Id.; Avemco Ins. Co. v. Cessna Aircraft Co., 11 F.3d 998, 1000 (10th Cir. 1993).

Cincinnati appears to assert that the subrogation relationship ended at the time Cincinnati paid OCDA. Cincinnati argues that OCDA could not have pursued a compulsory counterclaim because OCDA had no interest in the subrogation claims after compensation and therefore did not have standing to seek recovery as Cincinnati could be the only real party in interest pursuant to West Virginia Rule of Civil Procedure 17(a). Cincinnati argues that even if OCDA retained some interest in the claims, OCDA assigned its interest in subrogation claims to Cincinnati in the Proof of Loss. Cincinnati also argues that West Virginia law is clear that once a subrogating

carrier places an alleged tortfeasor on notice of its claim, the actions of the insured cannot prejudice that claim.

Cincinnati relies heavily in its briefing on two West Virginia cases, <u>Nationwide Mutual Insurance Company v. Dairyland Insurance Company</u>, 445 S.E.2d 184 (W. Va. 1994), and <u>Provident Life and Accident Insurance Company v. Bennett</u>, 483 S.E.2d 819 (W. Va. 1997), which involve insurance companies bringing subrogation claims after insureds settled with and released the tortfeasors' insurance companies. In <u>Nationwide</u>, a driver of an automobile, insured by Nationwide, was struck by a negligent driver, insured by Dairyland. <u>Nationwide</u>, 445 S.E.2d at 185. Nationwide paid its own insured for her medical expenses in the amount of $2,235.25. <u>Id.</u> at 186. In November 1987, Nationwide, by letter, informed Dairyland that it was seeking reimbursement of its medical payments. <u>Id.</u> In March 1988, Dairyland settled with Nationwide's insured for $500.00 and a full and complete release. <u>Id.</u> Dairyland then refused to pay Nationwide. <u>Id.</u>

In <u>Provident</u>, an insured had family health care coverage through Provident and automobile insurance through State Farm. <u>Provident</u>, 483 S.E.2d at 237. The insured's wife and children were involved in a single vehicle accident. <u>Id.</u> Provident paid $29,137.08 for medical treatment and expenses. <u>Id.</u> Provident corresponded with the insured or his counsel numerous times as to the availability of a third party claim for injuries sustained by

the insured's children for purposes of seeking reimbursement.  Id. at 238.  Provident was not informed that a claim had been filed with State Farm until almost fourteen months after the accident. Id.  Provident immediately notified State Farm of its subrogation claim on March 21, 1989.  Id.  On April 3, 1989, the insured's daughters settled with State Farm for $87,000.00 at a summary proceeding.  Id.  State Farm received a full release.  Id. Provident was unaware of the summary proceeding and did not appear. Id.  State Farm refused to pay Provident because of the full release.  Id.

The West Virginia Supreme Court held in these cases that the "subrogation rights of an insurance carrier are not barred so long as the tortfeasor's insurance carrier was notified of the subrogation claim <u>before it settled with the insured</u> who received the medical payments."  Syl. pt. 3, Nationwide, 445 S.E.2d 184 (emphasis added).  The court stated the rule as follows: "[i]t is generally held that where the tortfeasor obtains a release from the insured with knowledge that the latter has already been indemnified by the insurer, such release of the tortfeasor does not bar the right of subrogation of the insurer."  Id. at 187 n.4 (citing 16 George J. Couch, Couch Cyclopedia of Insurance Law § 61:201 (2d ed. 1983)).  While "Nationwide places the initial burden of payment of a subrogation claim on a liability carrier who has timely knowledge of the claim or should have known of the claim," Provident, 483

S.E.2d at 824, the <u>Nationwide</u> Court also stated that there "may be an occasion where the insured who is represented by counsel participated in some fraudulent scheme against the subrogation carrier that would require that general priority to be reversed." <u>Nationwide</u>, 445 S.E.2d at 188.

The facts in the present case are very different from the facts of <u>Nationwide</u> and <u>Provident</u>. In the West Virginia cases, the insured's insurance company paid the insured an amount of money. The insurance company then notified the other insurance company from which it sought payment, notifying them of the subrogation suit. After knowledge of the subrogation suit, the insured then settled with the other insurance company and signed a full release. In this case, Cincinnati sent OCDA a letter. This letter merely put Cost on notice of a <u>potential</u> claim. Cost then responded in a letter to Cincinnati, stating that <u>if</u> Cincinnati chose to bring a subrogation claim, it would defend against the action. Eight months after Cost received the letter from Cincinnati regarding the potential claim, it filed suit against OCDA to recover unpaid costs pursuant to the construction contract. While that suit was proceeding, Cincinnati paid OCDA and obtained the Proof of Loss form, which subrogated the claim from OCDA to Cincinnati. After Cincinnati paid the money to OCDA, OCDA settled the state law action. In contrast to <u>Nationwide</u> and <u>Provident</u>, the insurance company seeking subrogation, here Cincinnati, did not notify either

12

the alleged tortfeasor, here, Cost, or the alleged tortfeasor's insurance company, Liberty Mutual, of payment to OCDA. This Court finds that while Cost did know about the potential for a subrogation claim, Cincinnati did not notify Cost of payment or the claim until after the state law action had been settled.

Another difference in this action from <u>Nationwide</u> and <u>Provident</u> is that the settlement between OCDA and Cost did not compensate OCDA for damage, but instead compensated Cost for unpaid amounts pursuant to the construction contract. As mentioned above, Cincinnati believes that OCDA lost its interest in the subrogation claim after the Proof of Loss was signed and that it alone became the real party in interest.

First, as to the assertion that OCDA lost its standing to pursue a counterclaim because of the payment, this Court points out that OCDA's answer to the state court action complaint was due prior to the December 18, 2008 Proof of Loss. Accordingly, at the time of the answer, when OCDA should have filed a counterclaim, Cincinnati was not yet a subrogee of OCDA.

Secondly, as to Cincinnati's argument that it alone was the real party in interest, at the time of the suit, Cincinnati was not yet a subrogee. Cincinnati states that in the case of an insurer which has become subrogated to the rights of its insured, the carrier is the only real party in interest and suit must be brought in its name. <u>United States v. Aetna Cas. & Sur. Co.</u>, 338 U.S. 366

13

(1949). While Cincinnati is correct, if the insured has any uncompensated claim for which it may seek recovery, it is still a real party in interest. Travelers Ins. Co. v. Riggs, 671 F.2d 810, 813 (4th Cir. 1982). In this case, OCDA was still a real party in interest because of its payment of its $5,000.00 deductible. Id. Cincinnati argues that even if OCDA retained some interest after being compensated, OCDA assigned its interest in the subrogation claims to Cincinnati in the Proof of Loss. OCDA, the party in the previous state court litigation who had knowledge of the Proof of Loss, did not join Cincinnati in the state court action. While Cincinnati might, arguably, have a claim for breach of an agreement with OCDA, it does not have a cause of action against Cost, and this Court expresses no opinion as to the merits of any such claim against OCDA.

Because this Court has found that Cincinnati, as subrogee of OCDA, stands in the shoes of OCDA and because this Court has found that OCDA did not lose its standing to pursue a counterclaim in the state court action and that OCDA retained its interest in the claims, this Court will now examine whether Cincinnati's claim is a compulsory counterclaim that must have been brought in the previous state court litigation. A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." W. Va. R. Civ. P. 13(a). "[C]laims and counterclaims arise out of the same 'transaction or

occurrence' when there is a logical relationship between the claim and the counterclaim." Syl. pt. 4, State ex rel. Strickland v. Daniels, 318 S.E.2d 627. A logical relationship exists where a claim:

> arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendants that would otherwise remain dormant.

State ex rel. Taylor v. Nibert, 640 S.E.2d 192, 196 (W. Va. 2006). The two claims here are not independent of each other. In the first Ohio County litigation, Cost litigated its right to payment for work performed under its contract with OCDA. In this action, Cincinnati alleges that Cost's work performed under the contract with OCDA was negligent and that Cost breached the contract with OCDA. This Court finds that these claims are logically related and therefore arise out of the same transaction or occurrence. Because this Court finds that Cincinnati's claim is a compulsory counterclaim and because Cincinnati stands in the shoes of OCDA and has no greater rights than OCDA, this Court finds that Cincinnati cannot bring its claim against Cost and Cost's motion for summary judgment must be granted.

## V. Conclusion

For the reasons stated above, this Court finds that defendant Cost Company's motion for summary judgment must be and is GRANTED.

15

Accordingly, it is ORDERED that this case be DISMISSED and STRICKEN from the active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED: January 12, 2011

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE